IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARGARET WISCHHOFF,

                    Plaintiff,

    v.

CITY OF MADISON, WISCONSIN,
LARRY NELSON, AL LARSON,
THOMAS HEIKKINEN and
KATHY CRYAN,

                    Defendants.

OPINION & ORDER

13-cv-35-jdp

---

Plaintiff, Margaret Wischhoff, was an engineer with the City of Madison Water Utility from 2002 until she was fired in 2010. Plaintiff contends that her termination culminated a long sequence of gender discrimination, her complaints about the gender discrimination, and retaliation for her complaints. She has sued the City of Madison and four of her superiors, alleging violations of her rights under Title VII of the Civil Rights Act and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

The defendants move for summary judgment on all of plaintiff's claims, contending that none of the adverse actions that plaintiff faced were motivated by discrimination or retaliation. Defendants make a plausible case that plaintiff was a demanding and difficult employee who, ultimately, failed to perform her assigned duties. But plaintiff contends that the full record tells a different story, in which the defendants documented her alleged deficiencies so that they could paper over their discrimination and retaliation. The court concludes that, at least for some of the acts alleged, plaintiff has adduced sufficient evidence to permit a reasonable jury to infer that she was a victim of discrimination or retaliation.

The defendants' motion for summary judgment will be denied, in part. Defendants are entitled to summary judgment that they did not discriminate or retaliate by declining to hire

plaintiff as water supply manager, by failing to reclassify plaintiff's position to the level of Engineer 4, or by reassigning her supervisory duties to the newly created construction engineer position. Defendants' motion is otherwise denied. Plaintiff may proceed to trial to prove her claims that her temporary assignment to the engineering division, and her subsequent discipline and termination, were motivated by gender-based discrimination or retaliation for her complaints about gender-based discrimination.

## UNDISPUTED FACTS

Margaret Wischhoff was hired as an engineer by the City of Madison Water Utility in 2002. She held undergraduate and graduate degrees in civil engineering and she had significant professional experience in water supply and groundwater management. She was certified as a "Professional Engineer," which meant that she was licensed to sign and seal engineering drawings. Based on her job duties and her qualifications, plaintiff was hired as an Engineer 3, at the third step of the four-step professional progression for engineers in the civil service system at the water utility. She reported to an Engineer 4, Dennis Cawley. Cawley reported to defendant Al Larson, the principal engineer in the water utility.

In 2004, plaintiff began to experience what she perceived as sex discrimination from Larson in her work assignments and in the way he spoke to her. In 2005, plaintiff and two other women complained to the city's human resources department and the affirmative action office about Larson's alleged discrimination. Although plaintiff had hoped that the affirmative action office would investigate but keep the complaint confidential, the affirmative action office engaged the city engineer, defendant Larry Nelson, and a female engineer from another city department to investigate. Larson was cleared, but in the process Nelson learned about plaintiff's allegations of sex discrimination.

2

A few months after plaintiff made her discrimination complaint, she was offered a transfer from the water utility to the sewerage section of the city's engineering division. The proposal was conceived by Larson and Nelson, together with the head of the water utility and the city's human resource director. At the time, Nelson was the head of the engineering division. Plaintiff declined the transfer because she did not want to leave the water utility, where she worked with water supply, the area of her greatest expertise and interest. Because a permanent transfer required the employee's consent, she remained in the water utility.

In October 2005, plaintiff requested that her position be reclassified to Engineer 4. To warrant reclassification, two conditions had to be satisfied: first, plaintiff herself had to meet the professional qualifications; second, the position had to require sufficient high-level independent work. Plaintiff had the qualifications because she was a certified Professional Engineer. She contended that although she reported to Crawley, her work was in fact equivalent to Crawley's and largely independent of his supervision. In evaluating plaintiff's request for reclassification, the city's human resource department determined that reclassification would be warranted if the water utility were reorganized so that plaintiff was no longer subordinate to Crawley. (Alternatively, the structure should be clarified to show that she *was* subordinate Crawley, in which case reclassification would not be warranted.) In response to the analysis of the human resources department, Larson designed a new level-4 "construction engineer" position for plaintiff, in which she would responsible for overseeing water utility construction projects. Plaintiff rejected this proposal because she did not want to give up her current blend of both construction supervision and design duties. The water utility was not restructured at the time, and plaintiff remained an Engineer 3.

In 2007, Nelson became interim general manager of the water utility, where he served until August 2008. Defendant Kathy Cryan, one of Nelson's direct reports, also came over from the engineering division to serve temporarily as a water supply manager.

In April 2008, plaintiff applied for the position of water supply manager at the utility. The position was to be filled through the city's civil service process, through which a number of applicants would be certified as qualified and granted interviews. The interviews would be conducted by a four-member panel, including Larson, Cryan, another man and another woman. Plaintiff and five male candidates were certified as qualified for the position and interviewed. Each candidate was scored by the panel on their responses to the same set of questions. One candidate, Joel DeMorrett, was unanimously ranked highest and was hired for the position. Plaintiff came in second.

In spring 2008, Nelson restructured water utility job duties by creating the position of "construction engineer" at Engineer 2. The new construction engineer took over supervision of field inspections in the water utility. Other water utility engineers retained some supervisory duties. But the reorganization left plaintiff with no supervisory duties, and the van that had been assigned to her to use while supervising field inspectors was reassigned to the water utility motor pool.

In May 2008, Nelson ordered plaintiff to keep her office door open because Nelson believed that a male co-worker was frequenting plaintiff's office and engaging in social conversations. No male employees of the water utility had been subject to that requirement.

In summer 2008, one of plaintiff's colleagues, Doug DeMaster, received his professional engineer certification. DeMaster's job duties already involved sufficient responsibility to warrant classification at Engineer 4; he lacked only the professional engineer certification. Once he received it, Larson and Nelson arranged to have DeMaster's position reclassified as an Engineer

4, resulting in a wage increase for DeMaster. Plaintiff asked Larson to reclassify her position, contending that it was warranted because she already had her professional engineer certification. Larson responded that the water utility did not need any more engineer positions at Level 4. He suggested that she petition the human resources department if she were interested in reclassification. Plaintiff did not request a human resources reclassification study.

However, plaintiff went to the human resources department, in October 2008, where she learned that Nelson had recently been there to report that plaintiff was in a sexual relationship with a co-worker. Plaintiff found out that Nelson had openly discussed this allegation with members of the human resources office, had discussed it in locations in which it could be overheard, and had reported it directly to Brad Wirtz, the head of human resources. Plaintiff went to meet Wirtz to complain that Nelson had been allowed to spread a false rumor about her sex life. Wirtz, plaintiff, and a third person met to discuss the incident. Wirtz dismissed plaintiff's concerns as merely a rumor and told her that she should not worry about it. The meeting ended with Wirtz ordering plaintiff to "get out."

About the same time, Wirtz, Nelson and defendant Thomas Heikkinen (who had recently taken over as general manager of the water utility) met to plan moving plaintiff from the water utility to the engineering division, headed by Nelson, where she would report to defendant Kathy Cryan. In exchange, an engineering division employee would be moved to the water utility. Neither plaintiff nor Cawley, her immediate supervisor, were consulted about the reassignment to the engineering department. The move was to be a temporary posting, for approximately a year, at which plaintiff would be assigned the task of reviewing repairs to the sewerage system. Although Nelson and Heikkinen described the opportunity as a "plum" that was important to the city, plaintiff did not want the assignment because she considered her area of expertise to be water supply, not sewerage. Over plaintiff's objection, in November 2008 she

was moved to the engineering division. During her reassignment, plaintiff was denied access to her office at the water utility, her keys to the water utility building were disabled, she was not listed on the water department phone directory, and she was not permitted to attend any water utility meetings, including those at which her ongoing projects would be discussed.

Plaintiff ran into difficulties with Cryan almost immediately. Shortly after she began working at the engineering division, Cryan gave plaintiff a "letter of instruction," a pre-disciplinary warning about misconduct which, if continued, could lead to discipline, including termination. Cryan's letter of instruction complained about plaintiff's attitude and communication with her coworkers. Plaintiff denied the alleged deficiencies in an extended email to Cryan and she filed a complaint with the City's Equal Rights Division. Sometime later, during a meeting to discuss plaintiff's job performance problems, plaintiff brought a recorder to the meeting. She was ordered by Cryan not to record the meeting, but Cryan believed that plaintiff had surreptitiously attempted to do so. Plaintiff denied that allegation, but she nevertheless was given a formal discipline for disobeying Cryan's order.

In spring of 2009, Cryan put plaintiff on a formal "Performance Improvement Plan" (PIP). The PIP listed detailed tasks that plaintiff was to complete, with standards and timelines for completing them. Plaintiff denied the deficiencies that were alleged against her as the basis for the PIP in a lengthy correspondence. The PIP required plaintiff to make detailed reports of her work progress and subjected her to close oversight by Cryan, who continued to assert that plaintiff's performance was substandard. Plaintiff disputed Cryan's criticism of her work in writing.

As a result of workplace stress, plaintiff suffered physical symptoms that required medical care. Her physician recommended that she take a medical leave and in the summer of 2009, she did so. In her absence, Adam Wiederhoeft, a junior water utility engineer, was temporarily

posted to the engineering division to complete the tasks plaintiff had been assigned. Although the parties dispute what work Wiederhoeft was actually assigned to do, he did not suffer the same restrictions that plaintiff did during the temporary posting. He retained his office and access to the water utility building, and he was allowed to continue participating in water utility meetings.

Plaintiff returned to work in August 2009. Prior to her return, she contacted Larson to indicate that unless she were instructed otherwise, she would return to her office at the water utility. Hearing no contrary instruction, she reported to the water utility and began to work, not under Cawley's supervision, but under Larson's. Larson immediately placed plaintiff on a new PIP, which he administered. Plaintiff was given four specific assignments and strict time budgets to complete them. Larson and Heikkinen made consistently critical progress reports, and plaintiff was terminated at the end of the six-month PIP. The reasons given were that she had failed to complete two wellhead protection plan assignments and had failed to begin two standard operating procedure assignments. Plaintiff disputed the criticism of her work and she submitted detailed progress reports tracking her efforts on the projects. Plaintiff contends that comparable wellhead protection plan assignments had taken years to complete and that the hours budget that she had been given under her PIP were grossly inadequate to complete those tasks. She contends that she made significant progress on the goals set for her.


ANALYSIS

Title VII of the Civil Rights Act prohibits workplace discrimination on the basis of sex, and it prohibits retaliation against an employee who asserts her Title VII rights. 42 U.S.C. §§ 2000e, et seq. To prevail on her claims here, plaintiff would have to show that she suffered significant negative treatment (an "adverse employment action" in the jargon of discrimination

law) and that the adverse action was either because of her sex, or that it was in retaliation for the assertion of her rights.[1]

Proving that an adverse action is the result of discrimination or retaliation is often difficult because discriminators are not typically open about their motives. Accordingly, to sharpen the difficult factual inquiry, cases applying Title VII have developed a burden-shifting framework in which an employee may prove discrimination through either a "direct" or an "indirect" method. Proof of retaliation is similarly difficult to obtain and the methods of proving retaliation are similar to those for proving the discrimination itself.

Under the direct method, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the adverse action was taken because of her membership in the protected class. The direct method requires proof that points directly to a discriminatory reason for the action. *Burks v. Wisconsin Department of Transportation*, 464 F.3d 744, 751, n.3 (7th Cir. 2006). The direct method, however, will rarely involve direct evidence, such as admission that the action was discriminatory. More commonly, the direct method will involve some "convincing mosaic" of circumstantial evidence that would allow the jury to infer that the action was taken for a discriminatory reason. *Id.*

The indirect method evolved from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and the cases following it. The indirect method does not require evidence that points directly to a discriminatory purpose. Rather, the indirect method allows plaintiff to show discrimination by pointing to appropriate "comparators," that is, employees not in the protected class, but otherwise comparable, who did not face the adverse action. If plaintiff makes this

---

[1] Because plaintiff's employer is a government entity, she also brings claims for violation of her rights under the Equal Protection Clause of the Fourteenth Amendment to the Constitution. The parties agree that the analysis of plaintiff's Equal Protection Clause claims is the same as her Title VII claims. The statutes of limitations are slightly different, but not in any way material to this opinion.

prima facie case, the burden shifts to the employer to show a legitimate, non-discriminatory reason for singling out plaintiff for adverse action. If the employer makes that showing, then the burden shifts back to the employee to demonstrate that the proffered reason is a pretext. If plaintiff succeeds in showing that the proffered reason was a pretext, a reasonable jury may draw the inference that employer's true purpose was discriminatory. Despite the apparent precision of burden-shifting approach, courts may consider the evidence in plaintiff's prima facie case also as evidence of pretext. *See, e.g. Coleman v. Donahoe*, 667 F.3d 835, 862-63 (7th Cir. 2012) (Wood, J., concurring) (advocating for the abandonment of the burden-shifting framework in favor of a flexible, common-sense approach).

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To avoid summary judgment here, plaintiff "must set forth specific facts showing that there is a genuine issue for trial." *Id.* A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

Plaintiff contends that seven actions are sufficiently adverse and either discriminatory or retaliatory:

> 1. The selection (by Nelson, Cryan, and Larson) of DeMorrett for the water supply manager position;
>
> 2. Nelson stripping plaintiff of her supervisory duties by creating the construction engineer position;
>
> 3. Larson declining to support reclassification of plaintiff's position in 2008;

9

4. Heikkinen and Nelson reassigning plaintiff to the engineering division for the sewerage project in October, 2008;

5. Cryan discriminating and retaliating against plaintiff via inappropriate assignments, discipline, and evaluations;

6. Heikkinen and Larson discriminating and retaliating against plaintiff via unfair assignments and evaluations; and

7. Heikkinen's termination of plaintiff.

Plaintiff appeals to a combination of both the direct and indirect methods to prove her case.

The defendants acknowledge that plaintiff is within a protected class and that she engaged in at least some protected activities in asserting her rights under Title VII. The defendants acknowledge that the failure to hire plaintiff for the water supply manager and her termination are sufficiently adverse to constitute actionable adverse actions under Title VII, but they contend that most of the others are not. Defendants offer documents and testimony that, if credited by the trier of fact, would demonstrate that plaintiff was not satisfactorily performing her duties once she was transferred to the engineering department for the sewerage project. But the defendants' central argument is that none of the complained-of actions were taken for discriminatory or retaliatory purposes.

Thus, to survive summary judgment, plaintiff must adduce sufficient evidence to allow a reasonable jury to infer that one or more of the defendants took one of the actions of which plaintiff complains for discriminatory or retaliatory purposes.

## A.  The selection of DeMorrett for the water supply manager position

Plaintiff contends that she was the victim of discrimination when DeMorrett was hired as the water supply manager in 2008. Plaintiff has made out a prima facie case of discrimination under the indirect method:  as a woman she was a member of a protected class; she was certified as qualified for the job by the human resources department; and the position went to a man.

10

But the city offers compelling evidence of a legitimate non-discriminatory reason for DeMorrett's hiring. DeMorrett was ranked highest by each of the four members of the interview panel, including its two female members. Plaintiff contends that the defendants' reason is a pretext because she was *more* qualified than DeMorrett. But the evidence plaintiff cites to support this argument shows only her own qualifications, not DeMorrett's. Dkt. 43, ¶ 11. With no evidence in the record to show that plaintiff was more qualified than DeMorrett, plaintiff has failed to raise a genuine dispute of fact concerning DeMorrett's allegedly inferior qualifications.

The undisputed evidence is that DeMorrett was hired through the City's standard process and that he was unanimously selected by an interview panel with two men and two women as the most qualified candidate. Accordingly, defendants are entitled to summary judgment as to this alleged act of discrimination. Plaintiff will not be allowed to proceed to trial on the theory that she was the victim of discrimination or retaliation when DeMorrett was hired as the water supply manager.

## B. Nelson's reassignment of plaintiff's supervisory duties

Plaintiff contends that she suffered a discriminatory adverse action when Nelson created the position of construction engineer which had the effect of stripping plaintiff of all her supervisory duties. Previously plaintiff's job duties included both design work and supervision of field inspectors, but after the creation of the construction engineer position, she supervised no one. Plaintiff contends that male engineers in the water utility continued to have supervisory responsibilities even after the creation of the construction engineer position. The defendants contend that the reassignment of plaintiff's supervisory duties to the construction engineer is not an actionable adverse action and that it was not undertaken for any discriminatory reason.

Plaintiff did not want to give up her supervisory duties, but as defendants point out, "not everything that makes an employee unhappy is an actionable adverse action." *Nichols v. S. Ill.*

11

*Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). For purposes of Title VII, there are three general categories of actionable, materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Id*.

In this case, plaintiff's compensation, benefits or the financial terms of her employment were not downgraded as a result of the creation of the construction engineer position because she remained an Engineer 3. Thus, the question is whether the change reduced her career prospects by preventing her from using her skills so that they would atrophy, or whether the change in conditions subjected her to humiliating, degrading or otherwise significantly negative alteration in her workplace environment. Plaintiff adduces no evidence that would show that her career prospects would be limited as a result of the assignment of her supervisory duties to the construction engineer. Although plaintiff had recently completed the city's supervisory academy, plaintiff adduces no evidence that the reassignment of construction supervision would have any long-term impact on her career prospects with the city. Although certain of the male engineers in the utility retained some supervisory responsibilities, with minor exceptions all supervision of field inspections was reassigned to the new construction engineer. Plaintiff retained her design

responsibilities, which she apparently regarded as more important because she had previously declined the opportunity to concentrate on construction supervision. There is no evidence that as a result of the creation of the construction engineer position, plaintiff was subjected to any humiliating, degrading, unsafe, unhealthful or other significantly negative alteration in her workplace environment. Accordingly, the creation of the construction engineer position, and the resulting reassignment of some of plaintiff's duties to that position, is not an actionable adverse employment action.

Nor does the evidence support plaintiff's contention that the restructuring of the water utility was undertaken for a discriminatory purpose. Plaintiff makes essentially two arguments that the creation of the construction engineer position was undertaken for discriminatory purposes. First, she apparently relies on comparator evidence, that is, the fact that the other male engineers in the water utility retained some supervisory duties. Second, she argues that the city deviated from its usual hiring policies by putting Tammy Buss into the position of construction engineer when Buss lacked one of the essential qualifications. But, considered in context, neither of these arguments is persuasive. First, as for the comparator evidence, the court understands plaintiff to have invoked this evidence to show through the indirect method that Nelson's true motive was discrimination. But the comparators are not similarly situated. The male engineers who retained some supervisory duties were differently positioned. For example, plaintiff's supervisor, Cawley, retained supervisory duties after the reassignment because he was positioned at a higher level than plaintiff and had engineers subordinate to him. But even if there were proper comparator evidence, the effect of that evidence is simply to shift the burden to the city to provide a legitimate, non-discriminatory reason for the restructuring. The city has done so. The construction engineer position was created to address problems with water utility field inspections.

13

Plaintiff's attempt to discredit this explanation as pretext fails. Plaintiff contends that Tammy Buss was installed in the position without qualifications which demonstrates that the city's proffered reason was a pretext and that the true motive was discrimination. This argument fails because assigning plaintiff's supervisory duties to another woman hardly demonstrates intent to discriminate against women by denying them supervisory roles in the water utility. Moreover, Buss was one of the complainants in the 2005 discrimination complaint against Larson, so placing Buss in the construction engineer position also undermines any suggestion that the restructuring was motivated by retaliation for the 2005 complaint. In sum, there is no credible evidence to suggest that the creation of the construction engineer position and the resulting reassignment of plaintiff's field inspection supervision duties were motivated by either discrimination or retaliation.

## C. Larson's failure to support reclassification of plaintiff's position

Plaintiff contends that in 2008, Larson failed to support her reclassification to Engineer 4 for discriminatory or retaliatory reasons. Plaintiff contends that Larson's support for DeMaster's reclassification to Engineer 4, and Adam Wiederhoeft's reclassification to Engineer 2 and then 3, suggests that his failure to support her reclassification is gender discrimination.

Plaintiff appears to offer DeMaster and Wiederhoeft as comparators as indirect proof of discrimination. But plaintiff does not show that DeMaster and Wiederhoeft are sufficiently similar. DeMaster worked in a position of responsibility that warranted classification at Engineer 4. But DeMaster himself lacked the requisite credentials. Once he received his professional engineer certification, he had the credentials to warrant reclassification, and thus both criteria for reclassification were met. Plaintiff adduces no evidence to show how Wiederhoeft's reclassification up through the lower levels of the civil service classification is comparable to her request to be reclassified to the highest level.

14

The parties agree that plaintiff had the credentials to warrant reclassification to Engineer 4. But her position did not have sufficient independence to warrant that level, as the city's human resources department had previously determined. Larson suggested that plaintiff again seek reclassification of her position through the human resources department, but she did not pursue reclassification.

Under these circumstances, no reasonable jury could conclude that Larson had prevented plaintiff's reclassification to Engineer 4, or that his lack of effort to arrange plaintiff's reclassification was motivated by discrimination or retaliation.

### D. Plaintiff's reassignment to the engineering division

Plaintiff contends that her reassignment to the sewerage project at the engineering department was an adverse action undertaken for discriminatory or retaliatory purposes. The defendants contend that a temporary reassignment is not an actionable adverse action and that the purpose in assigning plaintiff to this task was not motivated by discrimination or retaliation.

Although a temporary reassignment is not generally an actionable adverse action, it can be if the assignment diminishes the employee's career prospects or is humiliating or degrading. *Nichols*, 510 F.3d at 780. The question of whether an action is sufficiently adverse to be actionable is ordinarily one for the jury. *Williams v. Bristol Myers Squibb Co.*, 85 F.3d 270, 273-74 (7th Cir. 1993). In this case, plaintiff has adduced evidence sufficient to submit the question to a jury.

Plaintiff's temporary, though extended, assignment to a sewerage project at the engineering division was not in the area of her expertise, which was water supply. Because the temporary assignment did not exploit plaintiff's specialized skills, the assignment was a significant deviation from her career progression. By placing her outside the area of her expertise, as well as her primary interests, the temporary assignment may have diminished her

15

career prospects. More important, plaintiff was also subjected to humiliating and degrading restrictions during the assignment: she was deprived of access to her office at the water utility building; her keys to the water utility building were disabled; she was removed from the telephone directory of the water utility; and she was prohibited from attending water utility staff meetings, including those that involved ongoing projects to which she would presumably return. Plaintiff's temporary assignment to the sewerage project in the engineering division was effectively an exile, and a reasonable jury could conclude that she had suffered an adverse employment action.

Whether plaintiff's assignment to the engineering division was undertaken for discriminatory or retaliatory purposes is a closer call. Defendants contend that the sewerage assignment was an important project for the city and that the defendants who made the decision to assign plaintiff to the project, Heikkinen and Nelson, had no reason to discriminate or retaliate against plaintiff. Plaintiff relies on both the direct and indirect approaches to establish a discriminatory or retaliatory motive.

For the direct method, plaintiff contends that suspicious timing suggests retaliation because her assignment to the engineering division immediately followed her complaint to the human resources office about Nelson spreading rumors about her alleged romantic relationship. Suspicious timing is circumstantial evidence that tends to support an inference of retaliatory or discriminatory behavior. *Coleman*, 667 F.3d at 860. Defendants contend that the decision to assign plaintiff to the engineering division was already in process by the time plaintiff made her complaint to the human resources department. But defendants take too narrow a view of the potential causal chain leading to plaintiff's reassignment. The decision to assign plaintiff to the engineering division was not yet final when she made her complaint to human resources, and thus her complaint may have been one factor in sending her to the engineering division. Also, by

16

the time Nelson and Heikkenen began planning the transfer, Nelson had already decided that plaintiff was engaged in a romantic relationship with a coworker, which had prompted Nelson to require plaintiff to keep her door open at all times, and had sent Nelson to the human resources department to complain about the relationship. The timing of the transfer to the engineering division could suggest to a reasonable jury that Nelson was looking for a way to get plaintiff out of the water utility because of his concern with plaintiff's romantic life, and that Nelson's concern with plaintiff's romantic life was a form of sex-based discrimination. Although plaintiff's 2005 complaint against Larson was three years old by this time, a jury could infer that Nelson harbored a belief that plaintiff was difficult to manage because of her willingness to voice complaints about gender discrimination. Taken as a whole, the circumstances would allow a reasonable jury to infer that Nelson was motivated to isolate plaintiff in an assignment away from the water utility for both discriminatory and retaliatory reasons, and that Heikkenen helped effectuate Nelson's plan.

Plaintiff also has evidence to prove discrimination through the indirect method in the form of a comparator, Adam Wiederhoeft. Wiederhoeft was a junior engineer who was assigned temporarily to the engineering division, allegedly to complete the assignments that plaintiff had failed to complete. The parties dispute the actual work Wiederhoeft performed at the engineering division. But there is no dispute that, during his temporary assignment, he retained access to his water utility workspace and telephone, that he remained on the water utility phone list, and that he continued to attend water utility meetings. He also continued to work on some of his water utility projects during his temporary posting at the engineering division. Wiederhoeft was also asked whether he would take the temporary assignment beforehand. The defendants contend that the difference between plaintiff's treatment and Wiederhoeft's are minor and that Wiederhoeft is not a reasonable comparator. But a comparator need not be

17

identical; the comparator only needs to be like in enough material respects to be suggestive of discrimination or retaliation. *Coleman*, 667 F.3d at 851-52. Whether a comparator is similarly situated to a plaintiff is generally a question of fact for the jury. *Srail v. Village of Lisle*, 588 F.3d 940, 945 (7th Cir. 2009). Although the defendants dismiss the differences between his treatment and plaintiff's as not significant, they offer no authority for that argument. A reasonable jury could find that the restrictions that plaintiff endured during her assignment to the engineering division were humiliating and degrading, and it is undisputed that Wiederhoeft, a less senior engineer, did not suffer them.

In sum, there is circumstantial evidence that would allow a reasonable jury to conclude that plaintiff's temporary reassignment to the sewerage project was undertaken for discriminatory or retaliatory purposes.

## E. Cryan's supervision and criticism of plaintiff at the engineering division

Once she was assigned to the engineering division, plaintiff was placed under the supervision of defendant Cathy Cryan. Plaintiff complains that Cryan subjected her to a sequence of unfair actions, including the letter of instruction, an unjustified discipline for recording a meeting, erratic and unreasonable work assignments, and the PIP. Defendants concede, at least implicitly, that the discipline and the PIP constitute adverse employment actions. Defendants contend that these actions were justified and, in any case, not motivated by retaliation or discrimination.

It is not clear whether plaintiff invokes the direct or indirect method to prove that Cryan's treatment was discriminatory or retaliatory. To make out a retaliation case under the direct method, plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action, and (3) there is a causal connection between her activity and the adverse action. *Coleman*, 667 F.3d. at 859. To make out a prima facie retaliation case under the

indirect method, plaintiff must show that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; (3) she was performing her job satisfactorily; and (4) no similarly situated employee who did not engage in the activity suffered an adverse employment action. *Squibb v. Memorial Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). Under either method, the most critical issue is whether plaintiff was performing her job satisfactorily (an element of her prima facie case under the indirect method) or whether Cryan's discipline and criticism of her was sincere or a pretext (evidence of the causal connection under the direct method).

Defendants contend that Cryan's criticism of plaintiff was justified: she had a poor attitude, was insubordinate, and did not do her assignments. In considering whether this justification is a pretext under the direct method, it does not matter whether Cryan's treatment of plaintiff was unfair or her criticism inaccurate. *Coleman*, 667 F.3d at 852-53. All that matters is that Cryan honestly believed that plaintiff warranted Cryan's discipline and criticism, and that that was why Cryan gave it. *Id.* To show that Cryan's treatment was pretextual, plaintiff must "'identify such weaknesses, implausibilities, inconsistencies, or contradictions' in the [City's account] 'that a reasonable person could find [it] unworthy of credence.'" *Id.* If the stated reasons were not really what induced Cryan to criticize and discipline plaintiff, the reasons are a pretext. *Id.* Plaintiff raises a genuine dispute as to whether Cryan's discipline and criticism was justified. Plaintiff's testimony and the contemporaneous records of her objections to Cryan's criticism (*e.g.*, Dkt. 44-21), if credited, would allow a jury to find that Cryan's discipline and criticism were not merely unfair or inaccurate, but falsely trumped up for an ulterior motive.

Looking at the issue under the indirect method, if plaintiff's evidence is believed, she was meeting the *legitimate* expectations of her employer. She makes out a prima facie case of retaliation if she establishes the fourth element, that is, if no similarly situated employee who

19

did not engage in the protected activity suffered an adverse employment action. Plaintiff has made that showing, because Cryan had never placed any city employee under a PIP.

Plaintiff has no evidence that Cryan personally was motivated to discriminate against plaintiff. Plaintiff's theory is that Cryan was in cahoots with Nelson, who was motivated to discriminate and retaliate. A reasonable jury could believe plaintiff's rebuttal of Cryan's criticism of plaintiff and her work, which would allow the jury to infer that the management of the water utility and the engineering department harbored gender-based animosity toward plaintiff. The evidence against Cryan is more attenuated than that against Larson and Nelson, but a reasonable jury could conclude that Cryan willingly participated in Larson's and Nelson's retaliation against plaintiff.

## F. Plaintiff's return to the water utility and her termination

After her medical leave, plaintiff returned to work at the water utility but not under Crawley's supervision. Instead, plaintiff was supervised directly by Larson who immediately put her on a new PIP. Plaintiff was given four specific assignments and she was required to submit detailed progress reports. Larson and Heikkinen were uniformly critical of her work, which she contends was grossly unfair and motivated by discrimination or retaliation. She was terminated at the end of the six-month PIP for failing to meet its objectives.

The analysis of plaintiff's treatment when she returned to the water utility follows the same principles as the analysis of her treatment by Cryan at the engineering division. Plaintiff has adduced evidence to raise a genuine dispute of fact as to whether her assignments under the PIP were reasonable ones, and whether the criticism of her performance was sincere or trumped up. She has evidence to suggest that the wellhead assignments could not have been completed within the deadlines she was given. She also has evidence that shows her own diligence in attempting to complete her assignments. If the jury credits her evidence, it could decide that the

PIP, and the criticism of her work under the PIP, were merely pretexts. Coupled with the other evidence of record on summary judgment, particularly the timing of the PIP and her termination, the jury could conclude that management of the water utility and the engineering division harbored gender-based animosity toward plaintiff, which was the true motivation for her termination.

## ORDER

IT IS ORDERED that:

1) Defendants motion for summary judgment is GRANTED with respect to plaintiff's allegations that she was unlawfully discriminated or retaliated against by defendants' declining to hire plaintiff as water supply manager; failing to reclassify plaintiff's position to the level of Engineer 4; and reassigning her supervisory duties to the construction engineer position.

2) Defendants' motion is otherwise DENIED. Plaintiff may proceed to trial to prove her claims that her temporary assignment to the engineering division, and her subsequent discipline and termination, were motivated by gender-based discrimination or by retaliation for her complaints about gender-based discrimination.

Entered this 9th day of July, 2014.

BY THE COURT:
/s/
JAMES D. PETERSON
District Judge

21